IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>**NASIR ULLAH,**<br>    a/k/a "Nas"<br>**FNU NAIMULLAH,**<br>    a/k/a "Nick"<br>    a/k/a "Naim Orakzai"<br>    a/k/a "Mullah"<br>    a/k/a "Nai Mullah"<br>    a/k/a "Nick John"<br>    a/k/a "Nai Ullah"<br>**PUQUAN HUANG,**<br>    a/k/a "Ken"<br>    a/k/a "Ken H"<br>    a/k/a "Look" | Criminal No.: 3:25cr606<br><br>18 U.S.C. § 1956(h)<br>18 U.S.C. § 982(a)(1)<br>21 U.S.C. § 853<br>28 U.S.C. § 2461(c)<br><br><br>**INDICTMENT** |

RECEIVED
APR 22 2025
FLORENCE, S.C.

**THE GRAND JURY CHARGES THAT:**

**GENERAL ALLEGATIONS**

At all times relevant and material to this Indictment:

**RELEVANT PORTIONS OF THE CONTROLLED
SUBSTANCES ACT AND MONEY LAUNDERING STATUTES**

1.    Under the Controlled Substances Act ("CSA"), no person may, without authorization, knowingly or intentionally manufacture, distribute, or dispense or possess with the intent to manufacture, distribute, or dispense a controlled substance, or conspire or attempt to do the same. 21 U.S.C. §§ 841 and 846. There are five "schedules" of controlled substances. Substances are "scheduled" based on their potential for abuse and recognized medical usage. 21 U.S.C. § 812, *et seq.*

2.    Violations of the CSA involving the felonious importation, receiving, buying, selling, or otherwise dealing in controlled substances are a "specified unlawful activity" for purposes of the

prohibitions outlined in 18 U.S.C. § 1956(a). 18 U.S.C. §§ 1956(c)(7), 1961(1).

## THE ROLE OF PROFESSIONAL MONEY LAUNDERING ORGANIZATIONS IN INTERNATIONAL DRUG TRAFFICKING

3. The United States is one of the world's largest and most lucrative markets in which to distribute illegal drugs.

4. Illegal drug distribution is a cash-intensive enterprise. International drug-trafficking organizations ("DTOs") involved in distributing large quantities of controlled substances generate large amounts of cash, which they have difficulty moving, spending, and investing without being detected by law enforcement. Because the cash is proceeds of a "specified unlawful activity," special care must be taken to transact the cash in a manner to avoid detection by law enforcement.

5. Many DTOs attempt to conceal the origin and the nature of drug proceeds through various money-laundering techniques, including techniques intended to move cash drug proceeds through the global financial system.

6. Professional money launderers are individuals, organizations, and networks that launder money in exchange for a fee or a commission. These professional money launderers provide the service of concealing the nature, source, location, ownership, control, origin, and/or destination of the funds to avoid detection, and sometimes also the transfer of funds across international borders.

7. Some professional money launderers operate as a group of loosely affiliated members while others operate as part of a money laundering organization ("MLO").

8. DTOs often hire professional money launderers or MLOs to launder drug proceeds back to the DTO in a manner that conceals the nature, source, location, ownership, control, origin, and/or destination of the funds. A money laundering "contract" is an agreement to obtain proceeds of a specified unlawful activity, such as illegal drug distribution, in the United States and conduct financial transactions with that money so it, or its equivalent value, can be provided to the

individuals and groups whose activities generated it. These professional money launderers and MLOs may earn a commission, a percentage of the money involved in the transaction, in return for their services.

9. Traditionally, DTOs relied on shipments of bulk cash moving from the United States, where drugs were sold, back to the countries in which the DTOs operated, such Mexico. This method, however, involves risk of seizure by law enforcement and the need to move large quantities of paper currency. In addition, advancements by law enforcement agencies around the world have made the depositing of this cash into the international banking system more challenging. In light of these challenges, DTOs and MLOs developed other means of repatriating drug proceeds from the United States to the DTOs.

10. Two common money laundering methods employed by professional MLOs to repatriate illegal drug proceeds from the United States to foreign DTOs are "mirror transfers" and "trade-based money laundering" ("TBML").

11. A "mirror transfer" occurs when a financial transaction in one location, such as the exchange of a certain amount of cash, triggers a reverse financial transaction in another location. A "mirror transfer" can operate as an underground currency exchange, where, for example, U.S. currency is purchased using another country's currency in a transaction overseas. This type of transfer allows value to be transferred between parties in different countries without the need for an international wire transfer.

12. TBML is a process of disguising criminal proceeds by various methods of moving value in trade transactions.

13. An increasing number of money laundering schemes involve money laundering

transactions in the People's Republic of China,[1] as recognized by the U.S. Department of the Treasury in a February 2024 National Money Laundering Risk Assessment. This is, in part, because of the existence and scale of "underground banking" or the "black market foreign exchange" for the exchange of foreign currency among the Chinese expatriate community in the United States, as well as the demand for U.S. dollars and avoidance of capital flight restrictions that would otherwise limit money transfers out of China.

14. MLOs in the United States use "mirror transfers" or TBML to transfer value to China without the need for international wire transfers.

15. In a typical drug money laundering cycle involving China, once MLOs take custody of drug cash in the United States, a member of the MLO, a money "broker," can release payment in local currency, such as pesos, to the DTO in a foreign country, typically in Mexico or elsewhere in Latin America, equivalent to the amount of drug cash that the MLO received in the United States minus a commission. After this initial "mirror transfer," the MLO transfers the value of the U.S. currency collected on behalf of the DTO from the United States to China, either through the "purchase" of U.S. dollars in a "mirror transfer" or in the form of a shipment of goods in the case of TBML. When the value of the proceeds arrives in China, either in the form of Chinese currency, known as yuan or renminbi ("RMB"), or in the form of goods to be sold, the value is typically used to finance the purchase of goods in China that are shipped abroad and sold for profit. This profit is used to reimburse the MLO money broker who originally released payment to the DTO, completing the money laundering cycle.

## COUNT ONE
*(Conspiracy to Launder Monetary Instruments)*

**THE GRAND JURY FURTHER CHARGES THAT:**

---

[1] References to China in this Indictment include Hong Kong.

16. The factual allegations contained in paragraphs 1 through 16 are re-alleged and incorporated as if set forth in their entirety.

## STATUTORY ALLEGATION

17. Beginning at least in or around April 2019 and continuing until at least on or about November 20, 2024, within the District of South Carolina and elsewhere, the defendants, **NASIR ULLAH, a/k/a "Nas" a/k/a "Nassir," FNU NAIMULLAH, a/k/a "Nick" a/k/a "Naim Orakzai" a/k/a "Mullah" a/k/a "Nai Mullah" a/k/a "Nick John" a/k/a "Nai Ullah," and PUQUAN HUANG, a/ka "Ken" a/k/a "Ken H" a/k/a "Look,"** did knowingly and intentionally combine, conspire, confederate, and agree with each other and others, both known and unknown to the Grand Jury, to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, to wit:

a. to conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is, the distribution of controlled substances, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, and knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

## WAYS, MANNER, AND MEANS

18. It was part of the conspiracy that the defendants and their co-conspirators would perform various tasks and take on various roles in furtherance of the conspiracy.

19. It further was part of the conspiracy that the defendants and their co-conspirators worked for an MLO that laundered approximately at least $30 million of proceeds related to the distribution of illegal drugs in the United States, which were imported primarily through Mexico.

20. It was further part of the conspiracy that the defendants and their co-conspirators would travel, or cause others to travel, to various locations throughout the United States, including to and through the District of South Carolina, to collect, and cause the collection of, millions of dollars of proceeds derived from the unlawful distribution of cocaine and fentanyl, among other drugs.

21. It was further part of the conspiracy that the defendants and their co-conspirators would verify their authority to collect drug proceeds by presenting a verification code to individuals from whom they expected to collect drug proceeds. This verification code typically was derived from a serial number on a U.S. dollar bill or other U.S. currency.

22. It was further part of the conspiracy that the defendants and their co-conspirators would use encrypted communications platforms, including the "WeChat" and "WhatsApp" applications to discuss their money laundering activities.

23. It was further part of the conspiracy that the defendants and their co-conspirators would send and receive electronic messages over these encrypted communications platforms that contained serial numbers for U.S. currency to be used as a verification code for the collection of drug proceeds at a particular location.

24. It was further part of the conspiracy that the defendants and their co-conspirators would meet in various locations to engage in hand-to-hand transactions in United States currency derived from illegal drug sales.

25. It was further part of the conspiracy that the bulk cash derived from drug trafficking that the defendants and their co-conspirators collected in these transactions often was concealed in bags and packaged in bundles with rubber bands and saran wrap.

26. It was further part of the conspiracy that the defendants and their co-conspirators used a real property located on Currituck Drive in Sumter, South Carolina, and a real property located on Rhododendron Street in Sumter, South Carolina, to store bulk cash and conceal the nature, source, ownership, and control of the money they received.

27. It was further part of the conspiracy that the defendants and their co-conspirators used businesses in the United States and abroad to conceal the nature, source, ownership, and control of the money they received.

28. It was further part of the conspiracy that the defendants and their co-conspirators communicated and coordinated with co-conspirators in China to arrange the laundering of proceeds through financial transactions that were designed to conceal the illicit source of the money, to include mirror transfers and TBML.

29. It was further part of the conspiracy that the defendants and their co-conspirators used bulk cash drug proceeds to purchase electronics and shipped these electronics to China, the Middle East, and elsewhere to conceal the nature, source, ownership, and control of the drug proceeds.

30. It was further part of the conspiracy that the defendants and their co-conspirators used notes and ledgers to keep track of financial transactions conducted in furtherance of the conspiracy.

### ACTS IN FURTHERANCE OF THE CONSPIRACY

31. On or about July 3, 2021, in or near Alamance County, North Carolina, **HUANG** picked up approximately two hundred seventy-two thousand dollars ($272,000) representing drug proceeds from a co-conspirator, who was subsequently identified as a Mexican cocaine trafficker. Law enforcement seized this currency during a subsequent traffic stop.

32. On or about March 3, 2024, in or near Pittsburgh, Pennsylvania and Charlotte, North Carolina, a co-conspirator picked up a total of approximately one hundred ninety-seven thousand seven hundred seventy dollars ($197,770) representing drug proceeds from co-conspirators, one

of whom was subsequently identified as a fentanyl trafficker. Law enforcement seized this currency during a subsequent traffic stop. The transfer of illicit proceeds was coordinated by **ULLAH** and other co-conspirators.

33. On or about October 9, 2024, in or near Richland County, South Carolina, **ULLAH** picked up approximately one hundred seventy-seven thousand eight hundred thirty-seven dollars ($177,837) representing drug proceeds from a co-conspirator. Law enforcement seized this currency during a subsequent traffic stop. The transfer of illicit proceeds was coordinated by **NAIMULLAH** and other co-conspirators.

34. On or about October 14, 2024, in or near Sumter, South Carolina, **ULLAH**, **NAIMULLAH**, and other co-conspirators attempted to ship a pallet of electronic devices, purchased with bulk cash drug proceeds obtained from co-conspirators, to Dubai, United Arab Emirates. Law enforcement seized this shipment of electronics before it was shipped overseas.

35. On or about November 20, 2024, in or near York County, South Carolina, a co-conspirator picked up approximately sixteen thousand dollars ($16,000) representing drug proceeds from a co-conspirator. Law enforcement seized this currency during a subsequent traffic stop. The transfer of illicit proceeds was coordinated by **ULLAH**, **NAIMULLAH**, and other co-conspirators.

(All in violation of Title 18, United States Code, Section 1956(h)).

## FORFEITURE NOTICE

THE GRAND JURY HEREBY FINDS probable cause that the property described in this NOTICE OF FORFEITURE is subject to forfeiture pursuant to the statutes described herein.

Pursuant to Fed. R. Crim. P. 32.2(a), the defendants are hereby notified that if convicted of the crime charged in the Indictment, they shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1) all property, real or personal, involved in the offense and any property traceable thereto.

The property subject to forfeiture includes, but is not limited to, the following:

a. One hundred seventy-seven thousand eight hundred thirty-seven dollars ($177,837.00) seized from **ULLAH** on or about October 9, 2024;

b. One hundred forty-three thousand four hundred eleven dollars ($143,411.00) seized from a co-conspirator's residence on or about January 23, 2025;

c. Forty-eight thousand seven hundred one dollars and twenty-five cents ($48,701.25) seized from **ULLAH** and **NAIMULLAH's** residence on or about January 23, 2025;

d. Twenty thousand six hundred ninety-four dollars ($20,694.00) seized from a co-conspirator's residence on or about January 23, 2025;

e. Twenty thousand four hundred forty-one dollars ($20,441.00) seized from **ULLAH** and **NAIMULLAH's** businesses on or about January 23, 2025;

f. Sixteen thousand dollars ($16,000.00) seized from a co-conspirator on or about November 20, 2024;

g. Fourteen (14) assorted electronic devices seized from **ULLAH** on or about October 9, 2024;

h. One hundred sixty-two (162) assorted electronic devices seized on or about October 14, 2024;

i. A sum of money equal to the value of the property involved in the money laundering offense charged in the Indictment, and all interest and proceeds traceable thereto, for which the defendants are liable as the result of their violations.

Pursuant to Title 21, United States Code, Section 853(p), the defendants shall forfeit substitute property, if, by any act or omission of the defendants, the property referenced above cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

(Pursuant to Title 18, United States Code, Section 982(a)(1); Title 21, United States Code, Section 853; Title 28, United States Code, Section 2461(c); and Federal Rule of Criminal Procedure 32.2(a).)

SIGNATURE PAGE FOLLOWS



A **True** Bill

FOREPERSON

BROOK B. ANDREWS
ACTING UNITED STATES ATTORNEY

By: _____
Everett E. McMillian
Assistant United States Attorney
401 W. Evans Street, Room 222
Florence, SC 29501
Tel: 843-665-6688
Everett.McMillian@usdoj.gov

MARGARET A. MOESER
Chief, Money Laundering and Asset Recovery Section
U.S. Department of Justice

By: _____
Mary K. Daly
Jasmin Salehi Fashami
Trial Attorneys